# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| REVVITY, INC. and REVVITY HEALTH SCIENCES, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No |
| WILLIAM HAUSER, SCOTT MCKINSTRY, ILIR MELKA, and REVIVO-DYNAMICS, INC., | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

_____

## COMPLAINT

Revvity, Inc. and Revvity Health Sciences, Inc. (together, "Revvity" or "the Company"), by their attorneys Epstein Becker & Green, P.C., bring this action against Defendants William "Will" Hauser, Scott McKinstry, Ilir Melka (together, the "Individual Defendants"), and Revivo-Dynamics, Inc. ("Revivo-Dynamics") (collectively with the Individual Defendants, the "Defendants"), for injunctive relief and damages, and allege as follows:

## NATURE OF THIS ACTION

1.       Revvity, a leader in developing and marketing pre-clinical imaging systems for use in life science research, brings this action to confront a deceptive scheme orchestrated from within Revvity's own ranks.

2.       Defendants Hauser, McKinstry, and Melka, all former Revvity employees, exploited their access to Revvity's customers, instruments, parts, supplier pipelines, and proprietary technical information to capitalize on Revvity's reputation and customer relationships

1

for their own personal benefit, by executing a complicated scheme intended to circumvent Revvity's normal processes, avoid detection, and self-deal.

3.    The Defendants acquired used Revvity instruments from Revvity's customers, refurbished the instruments with spare parts they had pilfered from Revvity, resold the instruments to other existing Revvity customers (and others), and covertly added the instruments onto Revvity service plans in order to secure Revvity's unwitting subsidizing of the maintenance and repair of these devices while profits flowed into Defendants' pockets.

4.    Revvity employed the Individual Defendants as service engineers and entrusted them with keeping Revvity instruments functioning with necessary precision and serving as Revvity's on-site presence with customers; they were the face of the business to many customers.

5.    In addition to repairing and maintaining imaging instruments, Revvity's service engineers were expected to identify opportunities for growth, including instances for Revvity's sales team to offer customers new products and services in place of aging instruments.

6.    Rather than acting in Revvity's best interests, as the Individual Defendants were legally obligated to do, they exploited their positions of trust and misdirected Revvity's business opportunities for their own profit, including to entities they personally own, control, or otherwise have a financial interest in.

7.    In so doing, Defendants individually and/or collectively as co-conspirators are liable for misappropriation of trade secrets, unfair and deceptive trade practices, conversion, breach of contract, and tortious interference with Revvity's business relationships. The Individual Defendants breached their fiduciary duties and duties of loyalty to Revvity and appropriated business opportunities that properly belonged to Revvity, and for that they must be held responsible.

## PARTIES

8.      Plaintiff Revvity, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 77 4th Avenue, Waltham, Massachusetts 02451.

9.      Plaintiff Revvity Health Sciences, Inc. is a corporation organized under the laws of Delaware with its principal place of business located at 77 4th Avenue, Waltham, Massachusetts 02451. The Individual Defendants were employed by Revvity Health Sciences, Inc.

10.     Upon information and belief, Scott McKinstry is a citizen of the Commonwealth of Massachusetts residing at his last known address of 21 Darnell Road Worcester, Massachusetts 01606.

11.     Upon information and belief, Ilir Melka is a citizen of the Commonwealth of Massachusetts residing at his last known address of 10 Homer Street, Worcester, Massachusetts 01602.

12.     Upon information and belief, William Hauser is a citizen of the State of Texas residing at his last known address of 16729 Stonefield St., Montgomery, Texas 77316.

13.     Upon information and belief, Defendant Revivo-Dynamics, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business located at 21 Darnell Road, Worcester, Massachusetts 01606.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the matter arises out of federal law.

15.     This Court has supplemental jurisdiction over Revvity's state law claims as these claims are part of the same case or controversy that forms the basis of Revvity's federal law claim.

16.     This Court has personal jurisdiction over Defendants because, among other things, Defendants McKinstry, Melka, and Revivo-Dynamics reside in the Commonwealth of Massachusetts and all Defendants regularly transacts business in the Commonwealth of Massachusetts, have caused tortious injury by an act or omission in the Commonwealth of Massachusetts, and derive substantial revenue from goods used or consumed or services rendered in the Commonwealth of Massachusetts.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred within this District and Defendants regularly transact business in this District.

## FACTUAL BACKGROUND

### A.  Revvity's Business and Products

18.     Revvity is a global leader in life sciences and diagnostics.

19.     Among other activities, Revvity designs, manufactures, and markets advanced imaging instruments for preclinical research.

20.     The Company specializes in *in vivo* imaging technologies that allow researchers to non-invasively visualize biological processes in living organisms.

21.     With nearly 30 years of experience in developing preclinical imaging instrumentation, Revvity provides essential research tools that enable critical discoveries in pharmaceutical development, oncology, immunology, neuroscience, and other biomedical fields.

22.     Revvity's imaging solutions serve a diverse customer base including pharmaceutical and biotechnology companies, academic research institutions, government laboratories, and medical research centers worldwide.

23.     Revvity's *in vivo* imaging portfolio includes the industry-leading IVIS® imaging systems, which utilize proprietary bioluminescence and fluorescence technologies to detect and quantify biological processes at the molecular level within living organisms.

24.     The Company also offers complementary technologies including micro-CT (IVIS SpectrumCT), optical tomography, and integrated analysis software that provides researchers with comprehensive imaging capabilities from whole-animal to cellular resolution.

25.     Revvity has established itself as the gold standard in preclinical optical imaging, with its IVIS® platform referenced in over 27,000 peer-reviewed scientific publications; this extensive publication record demonstrates the critical role Revvity's technology plays in advancing scientific knowledge and pharmaceutical development.

26.     Leading research institutions and pharmaceutical companies worldwide rely on Revvity's imaging systems for their precision, reliability, and reproducibility in preclinical research applications.

27.     Revvity's sophisticated imaging instruments incorporate complex components, including highly sensitive charge-coupled device cameras, proprietary optical configurations, advanced cooling systems, and precisely calibrated mechanisms that must work in concert to produce accurate, quantifiable data.

28.     These systems require specialized knowledge to manufacture, calibrate, repair, and maintain to ensure they deliver the exacting performance standards researchers require for their scientific investigations.

**B.  Revvity Service Contracts and the Role of Service Engineers**

29.     Given the considerable complexity and sensitivity of Revvity's *in vivo* imaging instruments, as well as the critical need for precision in the images produced for scientific research,

Revvity's customers depend on Revvity for regular maintenance, calibration, and repair to ensure that their sophisticated imaging equipment maintains optimal performance.

30.     To meet its customers' service needs, Revvity employs a specialized team of full-time service engineers who perform preventative maintenance, provide emergency repairs, troubleshoot technical issues, and install replacement parts for Revvity instruments purchased from or through Revvity or an authorized reseller and covered under warranty or a services contract.

31.     Revvity's service engineers undergo extensive and specialized training that on average spans approximately 6-12 months before they are fully qualified to independently service the Company's sophisticated imaging instruments.

32.     This comprehensive training program includes, among other things, virtual and in-person training, supervised field experience with senior engineers, and technical assessments.

33.     The substantial investment Revvity makes in developing and maintaining the specialized expertise of its service engineers reflects the complex and precise nature of the instruments and the critical importance of proper maintenance.

34.     This extensive proprietary training cannot be replicated outside of Revvity's authorized training program, which is maintained confidentially, and the knowledge gained constitutes valuable intellectual property and trade secrets of the Company.

35.     Revvity's service engineers, including the Individual Defendants, have significant responsibility for maintaining Revvity's customer relationships as well as the confidentiality of Revvity's and its customers' propriety and confidential information.

36.     For many customers, service engineers serve as the face of Revvity, often being the Company representatives with whom customers have the most frequent and sustained contact.

6

37.    Revvity's service engineers are responsible for diagnosing instrument issues, determining appropriate component replacements, ordering necessary parts through Revvity's Massachusetts-based supply chain, utilizing company resources for materials and travel, and performing precise calibrations using Revvity's confidential and proprietary tools, software, and procedures that are not available to third parties.

38.    Service engineers are required to document their work by completing detailed services reports with Revvity's Services System, which records tasks performed, labor hours, travel time, parts utilized, and other service notes from the visit.

39.    This documentation is essential for quality control, inventory management, continuity of service, service contract pricing, and accurate compensation of personnel.

40.    Revvity offers several tiered service contract options designed to maximize customers' laboratory productivity, minimize instrument downtime, and provide customers with predictable maintenance costs; all service plans help customers manage unexpected expenses, extend instrument life, and maintain compliance with research standards.

41.    Customers enrolled in Revvity's "Signature" service contracts (formerly known as "Gold") receive comprehensive coverage including unlimited repair visits, with service engineers' expenses for labor, travel, and non-consumable parts included in the cost; onsite preventative maintenance; phone support; priority response; and predictable pricing for service contract renewals.

42.    Other service contracts do not necessarily include the full cost of repair visits but offer more budget conscious options.

43.    Revvity's customers enrolled in service contracts that include costs of repairs are not impacted by the number of hours spent or the cost of parts the service engineers order or use

while servicing their instruments for those repairs covered under contract; these costs are included in the flat rate of the service contracts.

44.    Regardless of whether documentation of labor or parts directly impacts customers, Revvity relies on the accuracy of service documentation, time reporting, and parts usage records for critical business functions including resource allocation, inventory management, future service contract pricing, calculating pay and benefits, and performance-based compensation.

45.    To safeguard both the performance integrity of its instruments and its customers' substantial investments in these instruments, Revvity aims to ensure that only qualified, dependable, manufacturer-trained personnel perform service using genuine, properly sourced parts that meet Revvity's quality standards.

46.    Revvity implores customers to rely on Revvity and its team of trained personnel for performing service, as any service performed by unauthorized individuals or third-party companies would void applicable warranties, risks compromising instrument performance and data integrity, and may potentially create compliance issues; similarly any complications resulting from service performed by unauthorized third-parties falls outside the scope of Revvity's service contracts, potentially exposing customers to the risk of uncovered and unexpected repair costs.

### C.  Revvity's Reasonable Efforts to Protect its Confidential Information

47.    Revvity has in place policies, procedures, contractual obligations, and technical systems that protect its confidential and proprietary information from disclosure to others and from use by anyone for any purposes other than furthering Revvity's interests.

48.    Revvity has a number of practices and policies governing its confidential information, electronic communication, information security, and mobile computing, and each

employee is responsible for using Revvity's proprietary information, information technology ("IT") resources, and electronic systems in a productive, ethical, and lawful manner.

49.     As just one example, as a condition of their employment with Revvity, Revvity employees, including the Individual Defendants, are required to sign or otherwise acknowledge and agree to an Employee Patent and Proprietary Information Utilization and Non-Solicitation Agreement ("Information Utilization Agreement").

50.     The Information Utilization Agreement prohibits Revvity employees, during employment and for a period of one year after the termination or cessation of employment with Revvity for any reason, from contacting Revvity customers for competitive purposes or soliciting Revvity employees or customers, and indefinitely from using or disclosing any confidential or proprietary information, including without limitation, customer lists, part information, and repair standard operating procedures.

51.     The Information Utilization Agreement also expressly reminds employees of their inherent fiduciary duty of loyalty, and employees agree "to devote all…business time, attention, skill and effort to the performance of … duties for the Company, and to promoting the interests and business of the Company."

52.     Employees further acknowledge in the Information Utilization Agreement that they "owe a duty of loyalty to the Company, and agree not to engage in, or contract with others to engage in, directly or indirectly, any business or other activity which is in competition with or may reasonably result in competition with the Company."

53.     Revvity proprietary information, as defined in the Information Utilization Agreement, also includes all results, intermediate and final, of Revvity's research activities, business, manufacturing, service and research methods, including without limitation product

designs, specifications, and repair information; manufacturing procedures and tolerances; research tools; test procedures; prices and pricing formulae; cost information; customers' special materials and product specifications and requirements; information concerning suppliers; sales records; sales reports; customer lists; equipment lists; unit histories; Customer Relationship Management data; customer contact information; customer contact reports; and customer records.

54.    Revvity employees are required to maintain the confidentiality of all materials or media containing Revvity's proprietary information both during and after employment with Revvity, and use such information only in the performance of duties for Revvity.

55.    Revvity employees are prohibited from copying or removing Revvity proprietary information except in the pursuit of Revvity business, are required to return all copies of Revvity's information or property upon their termination, and are prohibited from retaining any Revvity property or information.

56.    The Information Utilization Agreement entered into by Defendant Melka restricts him during his employment and for a period of one year after termination or cessation of employment with Revvity for any reason, from directly or indirectly working for any customer of Revvity for whom he performed any services for within the prior year, or working for another, competing employer and performing any service performed within the year prior to the termination or cessation of employment with Revvity.

57.    All Revvity employees, including the Individual Defendants, are likewise subject to and acknowledged acceptance of the Company's U.S. Employee Handbook, which was last updated November 15, 2023 ("Handbook"), and the Company's Standards of Business Conduct policy, which was last amended in April 2023 ("Standards of Business Conduct").

58.     Revvity requires employees to signify their understanding of, and agreement to, the terms and conditions of Revvity's policies regarding use of Revvity's property and information, as a condition of their employment, by signing or otherwise acknowledging Revvity's Handbook and Standards of Business Conduct, pursuant to which each Revvity employee again agrees to refrain from disclosing any confidential information to third parties, even after leaving Revvity employment, and from using any such information for personal or other purposes.

59.     Pursuant to the Standards of Conduct, which all Revvity employees receive and are trained on annually, all Revvity employees are required at all times to protect Revvity's proprietary and confidential information and intellectual property, as well as other Revvity assets, including its facilities, equipment, and inventory, and intangible assets such as patents, copyrights, and trade secrets, and guard against waste, abuse, theft, and carelessness of Revvity's tangible and intangible assets.

60.     Specifically, the Standards of Conduct restricts use of Revvity property, facilities, equipment, inventory, and information solely for Revvity purposes unless expressly permitted with the approval of managers having authority to permit use for non-Revvity purposes.

61.     Further, pursuant to the Standards of Conduct, during their employment with Revvity, all Revvity employees are prohibited from accepting outside employment that interferes with the employee's productivity, job performance, or ability to act in Revvity's best interest or which represents a conflict of interest, and requires obtaining appropriate managerial approval before beginning any part-time employment or consulting activity that involves a significant amount of time during normal working hours.

62.    Moreover, the Handbook includes provisions requiring employees to record accurate daily records of hours worked, and mandating the maintenance of Revvity property according to Revvity rules and regulations.

63.    Revvity utilizes policies and procedures governing information and data security that state, in relevant part, that data and information on Revvity's internal systems or networks is proprietary and confidential, including customer- or instrument-specific calibration files or data.

64.    Revvity regularly reminds employees of the confidential and proprietary nature of its sales and pricing information by, among other things, requiring employees, including the Individual Defendants, to participate in regular training concerning Revvity's Standards of Business Conduct and IT policies and procedures.

65.    Further, Revvity restricts physical access to its equipment, supplies, and facilities by, among other things, limiting access to authorized employees, requiring visitors to register with security and obtain authorization from Revvity to enter the facilities, and preventing guests to any Revvity facility from venturing unescorted into secure areas or to access Revvity's confidential information unless they or their employer executed appropriate non-disclosure agreements with Revvity.

66.    Revvity also restricts access to its computer systems, by, among other things, maintaining advanced computer security systems and requiring the entry of a username and password to gain access to Revvity's computer systems, which includes trade secrets, confidential, and proprietary information.

67.    Revvity implements data classification procedures, whereby correspondence, emails, and other documents containing confidential or proprietary information bear labels

reminding employees to consider confidentiality issues before using or disclosing documents or information.

68.     Further, to the extent that confidential information exists in written paper form, such writings are kept in secured areas with access limited to those who need it for proper business purposes.

69.     Additionally, Revvity has in place electronic systems that monitor activity such as the downloading of files and information from Revvity's networks or computers to portable devices, personal e-mail accounts, or to cloud storage services.

70.     Revvity maintains service engineer records, including hours logs, parts order forms, and product inventory to ensure that all service-related practices and supplies are accounted for and consistent with expectations.

**D.   Hauser's, McKinstry's, and Melka's Employment with Revvity**

71.     Hauser began his employment with Revvity on December 5, 2005, as a Principal Customer Support Engineer.

72.     McKinstry began his employment with Revvity on November 7, 2011, as a Principal Customer Support Engineer.

73.     Melka began his employment with Revvity on December 3, 2012, as a Senior Manufacturing Technician, and he became a Customer Support Engineer on or about October 5, 2020.

74.     The Individual Defendants remained employees of Revvity until April 25, 2025, when each was terminated for cause for the conduct described herein.

75.    Upon accepting employment with Revvity, known then as PerkinElmer, Inc.[1], each of the Individual Defendants confirmed that he would comply with the Company's Handbook and Standards of Business Conduct.

76.    During the course of his employment, each Individual Defendant executed a version of the Information Utilization Agreement.

77.    Hauser executed the Information Utilization Agreement on December 21, 2011[2].

78.    McKinstry executed the Information Utilization Agreement on March 6, 2017.[3]

79.    Melka executed the Information Utilization Agreement on August 16, 2018.

80.    The Individual Defendants acknowledged and agreed to Revvity's updated policies regarding use of Revvity's property and information as a condition of their employment by signing or otherwise acknowledging Revvity's updated Handbook and Standards of Business Conduct, and agreed to refrain from disclosing any confidential information to third parties and from using any such information for personal or other purposes.

81.    Every time he did so, each Individual Defendant reiterated his agreement to protect Revvity's proprietary and confidential information and intellectual property, as well as other Revvity assets, including its equipment and inventory, copyrights, and trade secrets, and to refrain from waste, abuse, and theft of Revvity's tangible and intangible assets.

82.    Each Individual Defendant expressly acknowledged and agreed to act in accord with his duty of loyalty, each agreeing in their Information Utilization Agreement to devote all of

---

[1] In March 2023, Revvity Inc. (then named PerkinElmer, Inc.) divested its applied, food and enterprise services (AES) businesses, which kept the name PerkinElmer, and changed the name of the remaining business, which employed the Individual Defendants, to Revvity. To avoid confusion, the company will be referred to herein as "Revvity" or the "Company" regardless of the timeframe.

[2] Hauser previously executed a similar agreement with the Company on December 5, 2005.

[3] McKinstry previously executed a similar agreement with the Company on December 7, 2011.

his business time, attention, skill and effort to the performance of his duties for the Company, and to promoting the interests and business of the Company, and agreed not to engage in, or contract with others to engage in, directly or indirectly, any business or other activity that is in competition with or may reasonably result in competition with the Company.

83.    The Individual Defendants each agreed to use Revvity property, facilities, equipment, and information for Revvity purposes only, and none ever received approval from any managers with authority to permit use for non-Revvity purposes.

84.    The Individual Defendants were prohibited from accepting outside employment creating a conflict of interest with Revvity's business, and none ever obtained appropriate managerial approval for their competing outside activities.

85.    The Individual Defendants agreed to record accurate daily records of hours worked.

86.    The Individual Defendants each completed training regarding the protection of Revvity trade secrets and intellectual property through Revvity's web-based security and confidentiality training.

87.    As Service Engineers, the Individual Defendants each had responsibility for building relationships with customers serving as Revvity's onsite presence during the lifespan of an instrument, maintaining Revvity's reputation by ensuring quality of products in the field, and protecting Revvity's confidential and competitively advantageous information.

88.    Accomplishing these critical tasks required the Individual Defendants to possess a combination of technical know-how and deep understanding of, access to, and involvement with Revvity's confidential and proprietary information including customer lists, part information, repair procedures, research results, business, manufacturing, service and research methods, product designs, specifications, and repair information, manufacturing procedures and tolerances,

test procedures, prices and pricing formulae, cost information, customers' special materials and product specifications and requirements, supplier information, sales records and reports, customer lists, equipment lists, unit histories, Customer Relationship Management data, customer contact information, customer contact reports, and customer records.

89.     The Individual Defendants were each directly involved in confidential internal discussions and meetings concerning product designs, specifications, and repair information, pricing, costs, customers' specifications and requirements, supplier information, sales, and customer lists, including solutions that are not yet released to the public.

**E.  The Defendants' Misconduct and Diversion of Revvity's Business**

90.     The Individual Defendants engaged in a pattern of misconduct that violated their respective positions of trust at Revvity, as well as their legal and contractual obligations, and caused substantial harm to the Company through various improper activities and diversion of business opportunities.

91.     Upon information and belief, Defendants unlawfully profited off Revvity in at least two ways:

a)  First, Hauser, McKinstry, and Melka each submitted inaccurate service records or other reports in a concerted effort to extract inflated payment from Revvity for their own personal gain.

b)  Second, and more critical to Revvity's ongoing business, the Individual Defendants, in concert with third parties including Defendant Revivo-Dynamics and potentially others, abused the Individual Defendants' positions of trust within Revvity and capitalized on Revvity's trade secrets and reputation to divert business opportunities from Revvity.

16

1.  **Individual Defendants Submitted Fraudulent Service Records and Work Orders**

92.    The Individual Defendants each submitted inaccurate service records to Revvity through its ServiceMax and SFDC service systems, failing accurately to substantiate the amount of time spent on assignments and overstating the number of hours spent on customer service assignments.

93.    The Individual Defendants each submitted inaccurate timecards, work orders, and expenses to inflate their productivity metrics and misrepresent their work output for purposes of performance monitoring under the service incentive compensation plan (ICP).

94.    By inflating reported time at work sites or in travel, the Individual Defendants were able to manipulate the start timer for the "days to post" metric in the ICP—defined as the time taken to submit administrative paperwork after concluding on-site labor or travel—potentially increasing their incentive compensation by creating a false appearance of efficiency in completing administrative tasks.

95.    In other words, the Individual Defendants submitted inaccurate reports in their interest for the purpose of indicating they were working at and/or traveling to a work site longer than they actually were to mislead Revvity.

96.    For example, between May and June 2023, Hauser submitted timecards showing he was either working or traveling excessive hours on days that did not correspond to the dates he was performing work and submitting work orders on behalf of customers.

97.    For further example, in or about November 2020, McKinstry reported working and traveling to customer sites on days that he did not work or travel for the project he referenced.

98.     Demonstrating their fraudulent intent, in January 2025, Melka suggested to McKinstry and Hauser to write off older parts on their inventory lists to "play the system" and misleadingly avoid any negative impact on their quarterly bonus.

99.     Owing to the fact that all affected customers had "Gold" or "Signature" service plans, none of the Defendants' conduct caused customers to incur any undue expense or cost—only Revvity was harmed.

100.    Upon information and belief, these examples are part of a larger course of conduct by each of the Individual Defendants to submit false time records to Revvity for the purpose of misleading Revvity and exploiting the function of their compensation plans to extract maximum payments from Revvity, which they were not necessarily eligible to receive.

### 2. Defendants Convert Revvity Property and Opportunities for Their Own Benefit

101.    The Individual Defendants further engaged in a concerted scheme to convert parts and equipment from Revvity.

102.    As part of this scheme, the Individual Defendants individually or collectively submitted inaccurate reports and requisitions for parts and equipment, falsely representing that the items were intended for legitimate Revvity business purposes.

103.    Upon information and belief, a common method employed individually or collectively by the Individual Defendants to fraudulently obtain these parts at Revvity's expense was to add or allocate excess parts to customer service agreements, such as the Gold or Signature service contracts, under which the customer would not be separately invoiced for said parts.

104.    The fraudulently obtained parts and equipment were not used for any legitimate Revvity business; instead, the Individual Defendants individually or collectively converted these

Company-owned resources for their personal enrichment, including by diverting them to their own competing business ventures and/or by selling them for profit.

105.    For example, in or about March 2022, Hauser submitted a work order requiring the Company to purchase two cameras for a customer who only had one instrument requiring one camera.

106.    In or about November 2022, Hauser ordered four cameras and four shutters, purportedly for servicing an instrument only requiring one of each part.

107.    Again in October 2023, Hauser submitted a work order requiring the Company to purchase two cameras for a customer who only had one instrument requiring one camera.

108.    On another occasion in or about 2023, Hauser misleadingly reported to Revvity that he replaced a customer's computer system, a service requiring several parts obtained through a work order Hauser submitted; however, the customer's computer was not actually replaced at that time, and the parts Hauser ordered were not used.

109.    Upon information and belief, Hauser took the parts needed for replacing the computer system for his own personal benefit without informing Revvity.

110.    All of the parts Hauser ordered were provided through Revvity's Hopkinton, Massachusetts warehouse.

111.    Upon information and belief, Hauser took the surplus parts for his own personal benefit without informing Revvity.

112.    Similarly, on at least one instance, McKinstry purchased eight identical tool kits via Amazon.com and expensed the purchase to Revvity, despite not requiring all eight tool kits for Revvity-related work.

113.    In or about February 2021, McKinstry acquired a Revvity camera part without Revvity's knowledge or assent, refurbished the part himself before reselling the part to a customer for his own personal gain.

114.    While still employed by Revvity, the Individual Defendants individually or collectively leveraged their access to Revvity's customers, suppliers, pricing, cost, and other confidential information to exploit perceived limitations in Revvity's business, which included directing customers to their own competing businesses rather than providing solutions through Revvity's authorized channels.

115.    The Individual Defendants individually or collectively provided unauthorized assistance and access to third-parties, including Revivo-Dynamics, Willem Bio LLC, LumiGenics LLC, and others, by improperly directing decommissioned Revvity instruments and parts to unauthorized, third-party resellers in direct contradiction with Revvity's proper disposal procedures.

116.    This included not only diverting these imaging systems to third parties, but also shipping these systems to their own personal warehouses, rather than informing Revvity of instruments available for repurchasing, repurposing, or salvaging for usable parts.

117.    Consonant with their close contact with customers (due entirely to their employment with Revvity) and knowledge of the lifespan of instruments, Revvity service engineers are expected to identify opportunities for sales of new instruments at customer sites when operative instruments are candidates for replacement.

118.    These opportunities are part of Revvity's GROW program, a sales lead incentive program, identified herein as "GROW leads."

119. Revvity experienced a decrease in GROW leads generated by its service engineers beginning in approximately 2021.

120. On information and belief, the Individual Defendants were individually or collectively directing opportunities for sales of imaging instruments to third-parties or themselves, rather than communicating these GROW lead opportunities to Revvity's sales team or otherwise bringing opportunities to Revvity's attention.

121. By failing to identify GROW leads, the Individual Defendants individually or collectively cost Revvity an untold number of sales opportunities and associated profits, with each lost instrument sale representing potential revenue of approximately $250,000 to over $500,000 depending on the model and configuration.

122. With the assistance of the Individual Defendants, third-parties, including Defendant Revivo-Dynamics, would then resell or lease refurbished Revvity instruments to Revvity's existing or potential customers, thereby diverting the sale from Revvity to a third-party.

123. Upon information and belief, the Individual Defendants individually or collectively directed Revvity customers or prospective customers to doing business with Revivo-Dynamics or other competing businesses, which offered short-term rental or leasing options to existing or potential Revvity customers, selling used Revvity instruments, or for repurchasing older instruments, rather than bringing these opportunities to Revvity.

124. On information and belief, each of the Individual Defendants, often in concert with each other, engaged in a systematic pattern of misconduct whereby they arranged for third-parties to acquire used Revvity instruments for resale.

125. This scheme, which McKinstry began as early as 2014 and in which all Individual Defendants participated at some point during the relevant time period, occurred outside of

Revvity's approved decommissioning and disposal procedures, and without Revvity's knowledge or assent, and continued undetected into 2025, spanning over a decade.

126.    Highlighting the inappropriate nature of these actions, Revvity does not authorize third-party resellers of its instruments in the United States and Canada; accordingly, no Revvity employees are permitted to direct Revvity business to any third-party in the United States and Canada, as no third party is authorized to sell Revvity instruments in those markets.

127.    Upon information and belief, McKinstry and Hauser used parts acquired at Revvity's expense, such as new replacement cameras procured from Revvity's Hopkinton, Massachusetts warehouse, costing anywhere from approximately $20,000 to $80,000 each, to refurbish instruments, ensure they were working properly, and then provide them to third-parties, all during Revvity business hours and using Revvity's resources to accomplish personal business.

128.    Upon information and belief, the Individual Defendants individually or collectively provided Revvity property, including replacement parts, directly to third-parties without Revvity's knowledge or assent and outside of Revvity's practices for decommissioning and disposal.

129.    Upon information and belief, each of the Individual Defendants directed used Revvity instruments to competing businesses, including Revivo-Dynamics, Willem Bio LLC, or LumiGenics LLC, so that these entities could acquire, refurbish, and resell the instruments, rather than offering Revvity the opportunity to repurchase, refurbish, and resell the instrument itself, as required by Company policy.

130.    For example, Melka was in frequent contact with Revvity customers to divert business away from Revvity by providing competing quotes from Revivo-Dynamics for instruments or other services and convincing customers to opt for the Revivo-Dynamic-provided service at a cost savings to the customer.

131.    Upon information and belief, in other instances, McKinstry and Hauser arranged for Revvity to pass on opportunities to repurchase or re-acquire instruments from customers, by either convincing Revvity personnel to decline to acquire an asset by misleading Revvity into believing it was not a profitable option, or otherwise not presenting Revvity with the opportunity, so that they could direct the opportunity to third-parties or seize on the opportunity for their own personal benefit.

132.    Upon information and belief, each of the Individual Defendants provided maintenance services, performance advising, and troubleshooting services for Revvity instruments that customers obtained from third-parties, including Revivo-Dynamics, Willem Bio LLC, or LumiGenics LLC for their own personal benefit and without Revvity's knowledge or assent.

133.    These services were performed while the Individual Defendants were employed and being compensated by Revvity.

134.    Upon information and belief, McKinstry began developing his business plan for Revivo-Dynamics in or about 2019, formed an LLC initially in 2019, and then decided to form a corporation in Massachusetts in 2022 under the name Revivo-Dynamics, Inc. to facilitate his competing business without Revvity's knowledge or assent.

135.    According to his email correspondence, McKinstry formed Revivo-Dynamics expressly for the purpose of offering outsourced refurbishment of Revvity's preclinical imaging instruments, and contemplating "manifest[ing] into something bigger" and eventually taking on "different opportunities."

136.    Upon information and belief, McKinstry recruited Melka to become affiliated with Revivo-Dynamics, and Melka became an active participant in the scheme of directing business

opportunities away from Revvity and to Revivo-Dynamics for acquiring, refurbishing, selling, or transferring Revvity imaging instruments to customers.

137.    In support of Revivo-Dynamics' business, McKinstry downloaded, emailed, and otherwise provided copies of Revvity's customer lists and contact information, instrument requirements, calibration files, pricing and cost information, and product and service materials to third-parties, including Revivo-Dynamics and LumiGenics, Inc.

138.    Upon information and belief, McKinstry and Revivo-Dynamics transferred this proprietary information using various means including email, USB devices, and cloud storage services.

139.    On information and belief, the Individual Defendants individually or collectively provided or used Revvity's confidential and proprietary calibration files, product specifications, and customer requirements to or on behalf of third-parties without Revvity's knowledge or assent.

140.    These calibration files are particularly sensitive as they contain proprietary settings that are essential to proper instrument function and represent significant intellectual property developed by Revvity.

141.    On information and belief, Individual Defendants directed or introduced existing or potential Revvity customers to third parties, including Revivo-Dynamics, Willem Bio LLC, and LumiGenics, Inc., for obtaining Revvity instruments, including but not limited to a short-term lease for a bioluminescence imaging instrument, a fluorescence imaging system for sale, and other preclinical imaging needs, rather than bringing these opportunities to Revvity for consideration.

142.    On information and belief, the Individual Defendants conspired to add Revvity instruments they helped source or participated in sourcing from third-parties to existing or new customers' Revvity service contracts.

143.    This conduct violated Revvity's approved policies and practices which require a bona fide inspection and, if necessary, repair of such third-party instruments on a time and materials basis before they can be eligible for a Revvity service contract.

144.    Upon information and belief, Hauser and McKinstry subverted these controls by personally conducting, or causing to be conducted, sham inspections of the very instruments they were personally interested in having Revvity support.

145.    By falsely representing that these instruments met factory specifications, Hauser and McKinstry improperly passed the subsequent costs for maintaining and repairing these instruments onto Revvity under the guise of legitimate service contract obligations, all without Revvity's informed consent.

146.    On information and belief, Hauser provided Revvity property, including new parts, directly to third-parties without Revvity's knowledge or assent, and on at least one occasion, attempted to recover these parts when Revvity experienced a shortage.

147.    On information and belief, Revvity's customers believed they were obtaining Revvity equipment directly from Revvity or Revvity-affiliated entities as the customers were acting at the direction and recommendation of their Revvity service personnel, and belief they could add Revvity instruments purchased from third-parties to their Revvity service contracts.

148.    In or about 2022, Melka began directing Revvity's existing customers to work with Revivo-Dynamics, rather than Revvity, to fulfill requests.

149.    On multiple occasions, Melka directed Revvity customers to engage Revivo-Dynamics rather than Revvity for performing transportation services, and provided the customer with competing quotes from Revvity and Revivo-Dynamics, on one instance highlighting that he "work[s] as a contractor for ReVivo-Dynamics and they can complete the same job from [Revvity]

for less money," and further that he would personally complete the task regardless of which entity the customer selected.

150.    Melka further arranged for Revivo-Dynamics to reinstall and calibrate instruments, on information and belief, by using Revvity service personnel and resources, for the benefit of Revivio-Dynamics.

151.    This effectively allowed Revivo-Dynamics to offer services it could not have provided without converting and diverting Revvity's resources, property, information, and personnel.

152.    Melka, together with McKinstry, and on behalf of Revivo-Dynamics, offered Revvity customers free training sessions, directing customers away from Revvity-provided trainings for which Revvity charged.

153.    Melka marketed replacement parts provided by Revivo-Dynamics as less expensive options compared with purchasing directly from Revvity.

154.    Upon information and belief, these parts were either sourced from Revvity's own inventory or were non-genuine parts that did not meet Revvity's quality standards.

155.    Each of the Individual Defendants has directed customers to obtain replacement parts through unverified sources, for example via eBay, and the Individual Defendants would service the instruments with those parts rather than using Revvity-supplied materials.

156.    For example, one customer purchased a replacement part second-hand from an eBay seller based on the recommendation of their service engineer, Will Hauser, who forwarded the customer an email thread between himself and the seller.

157.    Thereafter, the instrument did not perform in accordance with expectations and Revvity was required to repair the instrument but could not guarantee the functionality of the instrument moving forward.

158.    Upon information and belief, the Defendants individually or collectively possess Revvity's confidential information and trade secrets, and despite informing Revvity that they have returned all Revvity property and information, the Defendants continue individually or collectively to possess confidential trade secrets and business information of Revvity, which they are poised to use and/or disclose.

159.    The scope and systematic nature of the data exfiltration suggests that significant proprietary information remains in their possession

### CAUSES OF ACTION

#### COUNT I
**Misappropriation of Trade Secrets in Violation of the
Defend Trade Secrets Act, 18 U.S.C. §§ 1836(B)(1), *et. Seq*
(Against All Defendants)**

160.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

161.    Revvity has expended considerable resources over many years to discover, amass, and protect certain non-public, highly valuable confidential and proprietary business information and trade secrets, including product and service information; the names of existing and potential customers and suppliers; calibration and technical specification requirements of particular customers; and pricing and cost information, among other information.

162.    Such information gives Revvity a significant competitive advantage over its existing and would-be competitors. This advantage would be lost or materially diminished if this information became known to its competitors.

163.    Revvity has made reasonable efforts to maintain the confidentiality of their proprietary business information and trade secrets, including but not limited to: (a) storing such information in a password-protected computer system; (b) storing certain highly confidential and sensitive information on databases with additional password protection; (c) limiting access to such information to certain employees with a need to know; (d) implementing multiple information protection documents and policies, including a the Handbook, Information Utilization Agreement, Standards of Business Conduct, and other confidentiality and information use policies; (e) limiting the use and disclosure of such information; and (f) requiring employees to return all copies of the information obtained from Revvity upon termination of employment.

164.    The Individual Defendants each had knowledge of, access to, and possession of Revvity's confidential and proprietary business information and trade secrets.

165.    By virtue of their position, the Individual Defendants each owed Revvity the duty to refrain from disclosing or exploiting Revvity's confidential and proprietary business information, customer relationships, property, trade secrets, and know-how for their own benefit, for the benefit of Revivo-Dynamics or other competitors, or to the detriment of Revvity.

166.    Because of the confidential and proprietary information and trade secrets to which each of the Individual Defendants was exposed, had access to, and received knowledge of in his role as a Service Engineers and because, upon information and belief, the Individual Defendants have served in similar capacities at Revvity's direct competitors, including Revivo-Dynamics, Willem Bio LLC, and/or LumiGenics LLC, it is inevitable that the Individual Defendants will rely on, draw from, and disclose (and Revivo-Dynamics and others will benefit from) the confidential and proprietary information and trade secrets learned during their employment with Revvity and retained after their termination from Revvity.

167.    Upon information and belief, the Individual Defendants actually or threatened to misappropriate Revvity's trade secrets, as is defined in 18 U.S.C. § 1839(5)(B), including but not limited to customer lists and contact information, instrument requirements, calibration files, pricing and cost information, and product and service materials, by either disclosing or using such information to or on behalf of Revivo-Dynamics and potentially other third-parties.

168.    The trade secrets that Defendants misappropriated were intended for use and/or were in fact used in interstate commerce.

169.    As a direct and proximate result of the Defendants' unlawful misappropriation of Revvity's trade secrets in violation of the DTSA, Revvity has suffered damages in an amount to be proven at trial.

170.    As a direct and proximate result of the Defendants' unlawful misappropriation of Revvity's trade secrets in violation of the DTSA, the Defendants have been unjustly enriched in an amount to be determined at trial.

171.    As a direct and proximate result of the Defendants' unlawful misappropriation of Revvity's trade secrets, Revvity has suffered and will continue to suffer irreparable harm if the Defendants' misappropriation and use of Revvity's trade secrets is not enjoined.

172.    The misappropriation of Revvity's trade secrets was done in bad faith and was willful and malicious.

### COUNT II
**Misappropriation of Trade Secrets in Violation of the Massachusetts
Uniform Trade Secrets Act, M.G.L. c. 93 §§ 42, *et. Seq*
(Against All Defendants)**

173.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

174.    Revvity has expended considerable resources over many years to discover, amass, and protect certain non-public, highly valuable confidential and proprietary business information and trade secrets, including product and service information; the names of existing and potential customers and suppliers; calibration and technical specification requirements of particular customers; and pricing and cost information, among other information.

175.    Such information gives Revvity a significant competitive advantage over their existing and would-be competitors. This advantage would be lost or materially diminished if this information became known to its competitors.

176.    Revvity has made reasonable efforts to maintain the confidentiality of its proprietary business information and trade secrets, including but not limited to: (a) storing such information in a password-protected computer system; (b) storing certain highly confidential and sensitive information on databases with additional password protection; (c) limiting access to such information to certain employees with a need to know; (d) implementing multiple information protection documents and policies, including a the Handbook, Information Utilization Agreement, Standards of Business Conduct, and other confidentiality and information use policies; (e) limiting the use and disclosure of such information; and (f) requiring employees to return all copies of the information obtained from Revvity upon termination of employment.

177.    The Individual Defendants each had knowledge of, access to, and possession of Revvity's confidential and proprietary business information and trade secrets.

178.    By virtue of their position, the Individual Defendants each owed Revvity the duty to refrain from disclosing or exploiting Revvity's confidential and proprietary business information, customer relationships, property, trade secrets, and know-how for his own benefit, for the benefit of Revivo-Dynamics or other competitors, or to the detriment of Revvity.

179.    Because of the confidential and proprietary information and trade secrets to which each of the Individual Defendants was exposed, had access to, and received knowledge of in his role as a Service Engineer, and because, upon information and belief, the Individual Defendants have served in similar capacities at Revvity's direct competitors, including Revivo-Dynamics, Willem Bio LLC, and/or LumiGenics LLC, it is inevitable that the Individual Defendants will rely on, draw from, and disclose (and Revivo-Dynamics and others will benefit from) the confidential and proprietary information and trade secrets learned during their employment with Revvity and retained after their termination from Revvity.

180.    Upon information and belief, the Individual Defendants actually misappropriated Revvity's trade secrets, as is defined in the MUTSA, including but not limited to customer lists and contact information, instrument requirements, calibration files, pricing and cost information, and product and service materials by either disclosing or using such information to or on behalf of Revivo-Dynamics and potentially other third-parties.

181.    As a direct and proximate result of the Defendants' unlawful misappropriation of Revvity's trade secrets in violation of the MUTSA, Revvity has suffered damages in an amount to be proven at trial.

182.    As a direct and proximate result of the Defendants' unlawful misappropriation of Revvity's trade secrets in violation of the MUTSA, the Defendants has been unjustly enriched in an amount to be determined at trial.

183.    As a direct and proximate result of the Defendants' unlawful misappropriation of Revvity's trade secrets, Revvity has suffered and will continue to suffer irreparable harm if the Defendants' misappropriation and use of Revvity's trade secrets is not enjoined.

184.    The misappropriation of Revvity's trade secrets was done in bad faith and was willful and malicious.

### COUNT III
### Breach of Contract
### (Against Defendants Hauser, McKinstry, and Melka)

185.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

186.    The Individual Defendants' Information Utilization Agreements are valid and enforceable contracts, which incorporate by reference Revvity's Standards of Business Conduct.

187.    The Individual Defendants received consideration for signing and entering into the Information Utilization Agreement, including employment with Revvity, certain employee benefits, and access to Revvity's confidential and proprietary information, among other things.

188.    At all relevant times, the Individual Defendants have been, and continue to be, bound by the terms of the Information Utilization Agreement and Standards of Business Conduct.

189.    The Individual Defendants breached the Information Utilization Agreement by misappropriating and retaining Revvity's confidential information and trade secrets, engaging in competitive activities with Revvity while employed by Revvity, soliciting business from Revvity's clients, directing corporate opportunities away from Revvity without first offering the opportunities to Revvity, taking and using Revvity property for personal benefit or the benefit of third parties, and intentionally entering false information on timecards, work orders, and expense reports to the detriment of Revvity.

190.    The Individual Defendants further breached the Information Utilization Agreements by, among other actions, failing to devote all business time, attention, skill and effort to the performance of their duties for the Company, and to promoting the interests and business of

the Company, and by engaging in, directly or indirectly, business in competition with or resulting in competition with the Company.

191.    Revvity performed each and every obligation required of it under each Information Utilization Agreement with the Individual Defendants.

192.    As a direct and proximate result of the Individual Defendants' breaches of their respective Information Utilization Agreement, Revvity has suffered and will continue to suffer damages and irreparable harm.

193.    Revvity was damaged in an amount to be determined at trial, including but not limited to lost profits from diverted sales opportunities, diminished value of customer relationships, costs for remediating customer issues Defendants caused, and costs for repairing damage to Revvity's goodwill and reputation.

194.    Injunctive relief is necessary as the recovery of money damages would not fully compensate Revvity for the Individual Defendants' breaches of the Information Utilization Agreement.

## COUNT IV
### Conversion
### (Against Hauser and McKinstry)

195.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

196.    As part of the scheme to compete against Revvity while still employed at Revvity, Hauser and McKinstry both acquired Revvity equipment, replacement parts, or tools without Revvity's knowledge or assent, and in doing so, wrongfully asserted dominion over Revvity's equipment, replacement parts or tools.

197.    As part of their scheme to compete against Revvity while still employed at Revvity, Hauser and McKinstry both exercised control over and possession of Revvity's business equipment, customer lists, office supplies, vehicles, computer system, e-mail system, telephone system, tools, and customer/supplier goodwill.

198.    Hauser and McKinstry both knew or should have known that the Revvity equipment, replacement parts, tools, business equipment, customer lists, office supplies, vehicles, computer system, e-mail system, telephone system, and customer/supplier goodwill belonged exclusively to Revvity.

199.    By knowingly and intentionally exercising control over and possession of Revvity's property, Hauser and McKinstry have converted the property of Revvity.

200.    As a direct result of the conversion by Hauser and McKinstry, Revvity has been harmed and will continue to face additional harm.

**COUNT V**
**Breach of Fiduciary Duty**
**(Against Defendants Hauser, McKinstry, and Melka)**

201.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

202.    As employees and agents of Revvity, the Individual Defendants owed Revvity undivided duties of loyalty, good faith, care, and honesty, and had a fiduciary duty not to divert corporate opportunities from Revvity for their own personal gain.

203.    Consistent with their fiduciary duties owed as Revvity employees, the Individual Defendants were obligated to act in good faith and in the best interests of Revvity, to refrain from engaging in self-dealing, and to avoid taking actions that would place the Individual Defendants' personal interests in conflict with those of Revvity.

204.    The Individual Defendants breached their fiduciary duties of loyalty to Revvity by, among other things: secretly diverting business opportunities belonging to Revvity; engaging in a competing business while still employed by Revvity; misusing Revvity's confidential information and resources for personal gain; failing to disclose material conflicts of interest; converting Revvity's instruments, supplies, or other property; and/or acting in furtherance of their own personal financial interests to the detriment of Revvity.

205.    In direct breach of their duties, and while still collecting compensation and benefits as agents and employees of Revvity, the Individual Defendants, performed services for Revivo-Dynamics and other third-parties in direct competition with Revvity.

206.    While still collecting compensation and benefits as agents and employees of Revvity, the Individual Defendants individually or collectively used Revvity's trade secrets and other property to compete against Revvity.

207.    In violation of their fiduciary duties, the Individual Defendants diverted business from their employer, Revvity, to Defendant Revivo-Dynamics and other third-parties.

208.    The diversion of corporate opportunities provided personal benefit to the Individual Defendants.

209.    The Individual Defendants' conduct was willful, intentional, and undertaken in bad faith.

210.    As a direct result of the Individual Defendants' breaches of their duties of loyalty, good faith, care, and honesty, Revvity has been harmed and face additional harm.

211.    Revvity was damaged in an amount to be determined at trial, including but not limited to lost profits from diverted sales opportunities, diminished value of customer

relationships, costs for remediating customer issues Defendants caused, and costs for repairing damage to Revvity's goodwill and reputation.

**COUNT VI**
**Tortious Interference**
**(Against All Defendants)**

212.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

213.    Revvity enjoyed business relationships and/or expectancies of business relationships with certain customers and potential customers, including those customers that possess or may possess an instrument marketed or manufactured by Revvity.

214.    The business relationships and expectancies described above had a likelihood of economic benefit to Revvity.

215.    As a result of their employment with Revvity and their access to Revvity's trade secrets and property, the Individual Defendants had and have intimate knowledge of Revvity's trade secrets, the business relationships and expectancies of Revvity with their customers and potential customers, and the goodwill and reputation of Revvity.

216.    Defendants knowingly and intentionally misused Revvity's trade secrets and property to induce Revvity's customers and potential customers to purchase goods and services from Defendants, when Revvity validly expected those customers and potential customers to purchase such goods and services from Revvity.

217.    Defendants knowingly and intentionally provided misleading information to Revvity customers to obtain business opportunities for their own benefit.

218.    Defendants' competition with Revvity while the Individual Defendants were still collecting compensation and benefits as agents and employees of Revvity constitutes a wrongful

act. Similarly, Defendants' intentional and unauthorized appropriation of Revvity's trade secrets and other property constitutes a wrongful act.

219.    The aforesaid acts of Defendants were inherently wrongful, and could not be justified under any circumstances.

220.    Defendants' actions have resulted in damages to Revvity in the form of disruption of the business, business relationships, and expectancies between Revvity and its customers, potential customers, suppliers and manufacturers.

221.    Revvity was damaged in an amount to be determined at trial, including but not limited to lost profits from diverted sales opportunities, diminished value of customer relationships, costs for remediating customer issues Defendants caused, and costs for repairing damage to Revvity's goodwill and reputation.

**COUNT VII**
**Fraudulent Misrepresentation**
**(Against Individual Defendants)**

222.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

223.    Each of the Individual Defendants individually made false representations of fact to Revvity. These false representations included reporting inaccurate information with respect to time worked or parts needed for performing services for customers and submitting inaccurate time records, inventory lists, and/or false work orders for parts that were not associated with work performed pursuant to a work order.

224.    The Individual Defendants knew that the above representations were false when made and intended to deceive Revvity and conceal the truth to avoid any detection of their unauthorized activities or negative impact on their bonus payments.

225.    The Individual Defendants made the above representations with the intent to induce Revvity to continue to employ the Individual Defendants, pay compensation and bonuses, and unknowingly supply the Individual Defendants with materials they used for their own personal gain.

226.    In justifiable reliance on the Individual Defendants' statements, Revvity provided the Individual Defendants with continued employment, payments, and materials the Individual Defendants would not have otherwise received absent the misrepresentations.

227.    As a result of Revvity's justifiable reliance on the Individual Defendants' misrepresentations, Revvity was damaged in an amount to be determined at trial, including but not limited to amounts paid to the Individual Defendants, costs of unauthorized acquisition of materials, lost profits from diverted sales opportunities, diminished value of customer relationships, costs for remediating customer issues Defendants caused, and costs for repairing damage to Revvity's goodwill and reputation.

### COUNT VIII
### Civil Conspiracy
### (Against All Defendants)

228.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

229.    Defendants each joined in an agreement or plan with each other to engage in the conduct described herein.

230.    This concerted action is done to accomplish an unlawful purpose as described herein.

231.    As a result of Defendants' actions, Revvity has suffered damages in an amount yet to be determined, and have suffered irreparable harm and loss.

## COUNT IX
### Unjust Enrichment
### (Against All Defendants)

232.    Revvity restates and incorporates herein by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

233.    Defendants are using and/or have received the benefit of using Revvity's trade secrets and other property for their own use and benefit and to the detriment of Revvity.

234.    The conduct of Defendants is inequitable and provides them unjust enrichment.

235.    Revvity has been and will continue to be damaged by the conduct of Defendants, in an amount that cannot yet be ascertained.

WHEREFORE, Revvity respectfully requests the following relief:

   a) Compensatory, consequential, incidental, and conversion damages in an amount to be determined at trial;

   b) Disgorgement of all profits earned by Defendants through their unlawful conduct;

   c) Multiple damages and attorneys' fees as permitted by contract, statute, or other applicable law;

   d) Punitive or exemplary damages based on Defendants fraudulent, intentional, and malicious conduct and/or pursuant to 18 U.S.C. § 1836(b)(3)(C) and/or other applicable law;

   e) Preliminary and permanent injunctive relief restraining the Defendants from:

      1. further misappropriating or using Revvity's trade secrets or confidential information;

      2. further breaching the Information Utilization Agreements each Individual Defendant entered into;

      3. further exercising possession or control of Revvity's property; and

      4. further tortiously interfering with Revvity's advantageous business relationships.

   f) Reasonable attorney's fees and costs of suit pursuant to 18 U.S.C. § 1836(b), and/or other applicable law;

g) Costs and expenses otherwise recoverable under the law;

h) Pre-and post-judgment interest at the highest legal rate; and

i) Any other relief as deemed to be warranted by this Court.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Respectfully Submitted,

*/s/ Katherine G. Rigby*
Katherine G. Rigby (BBO #676436)
Erik W. Weibust (BBO #663270)
Adam R.D. Paine (BBO #697246)
Epstein, Becker & Green, P.C.
One Financial Center, Suite 1520
Boston, MA 02111
Tel: (617) 603-1090
krigby@egblaw.com
eweibust@ebglaw.com
apaine@ebglaw.com

Date: June 6, 2025

*Counsel for Plaintiffs Revvity, Inc. and Revvity Health Sciences, Inc.*